# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

BRENDA SUE THOMAS,　　　　)

　　　Claimant,　　　　　　　)

v.　　　　　　　　　　　　　)　　　　CIVIL ACTION NO.

NANCY A. BERRYHILL,　　　　)　　　　5:17-CV-1075-KOB

ACTING COMMISSIONER OF　)

SOCIAL SECURITY,　　　　　)

　　　Respondent.　　　　　　)

## MEMORANDUM OPINION

## I. INTRODUCTION

On June 23, 2014, the claimant protectively applied for disability and disability insurance benefits under Title II of the Social Security Act and for supplemental security income under Title XVI. In both applications, the claimant alleged disability beginning on December 5, 2011, because of diabetes; high cholesterol; lung problems; high blood pressure; arthritis and neuropathy in her feet; bone spurs in her right foot; and broken left and right ankles with pins, plates, and screws. The Commissioner denied the claim on August 26, 2014. The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a video hearing on December 15, 2015. (R. 33-80, 94, 123-31, 132-34, 189-96).

In a decision dated January 26, 2016, the ALJ found that the claimant was not disabled as defined by the Social Security Act and was, therefore, ineligible for Social Security benefits. On April 27, 2017, the Appeals Council denied claimant's request for review. Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security

Administration. The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§405(g) and 1383 (c)(3). For the reasons stated below, this court REVERSES and REMANDS the decision of the Commissioner to the ALJ for reconsideration. (R. 1-3, 16-27).

## II. ISSUE PRESENTED

Whether the ALJ erred in not assigning weight given to the medical opinion of Dr. John Haney, PhD., who personally examined the claimant and reviewed her medical records.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if he applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. This court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that

would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d).

Whether a claimant meets a Listing and is qualified for Social Security disability benefits is a

question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence,

or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206,

1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the

significance of certain facts, the court has no power to reverse that finding as long as substantial

evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the

[Commissioner]'s factual findings." *Walker*, F.2d at 999. A reviewing court must not only look

to those parts of the record that support the decision of the ALJ, but also must review the record

in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ.

*Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

The ALJ must state with particularity the weight he gave different medical opinions and

the reasons for them; the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278,

279 (11th Cir. 1987); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). If the

ALJ at a minimum does not state with "some measure of clarity" the reasons for his decision in

discrediting the opinion of an examining physician, it is reversible error. *McClurkin v. SSA*, 625

F. App'x 960, 960 (11th Cir. 2015).

## V. FACTS

The claimant was fifty-eight years old at the time of the ALJ's final decision; has a GED;

has past relevant work as a waitress, meat clerk, and a convenience store clerk; and alleges

disability based on diabetes, high cholesterol, lung problems, high blood pressure, arthritis and

neuropathy in her feet, bone spurs in her right foot, and broken right and left ankles with pins, plates, and screws. (R. 21, 27, 46-47, 69, 189, 198, 205, 211, 241).

<em>Physical and Mental Impairments</em>

On February 7, 2012, the claimant saw Dr. Michael Dick of Alabama Medicine and Rheumatology complaining of ankle and back pain that resulted from a prior car accident in 1985. The claimant stated that her symptoms were constant and achy and that the pain radiates down both her thighs to just above her ankles. She reported that walking and prolonged standing worsen her pain. The claimant described her pain as an 10/10 in severity, with the past month ranging from 6/10 as a minimum to 10/10 as a maximum. Dr. Dick noted tenderness in both "gluteal and ischial bursae as well as over both sacroiliac joint margins." He also noted that she was tender in her hips and behind the bottom of both her knees. Additionally, Dr. Dick noted extra bone growth in both ankles and tenderness across the back of both ankles and on the sides. Dr. Dick diagnosed her with inflammation of her hips and pain in both legs; compressed nerves and traumatic osteoarthritis in both ankles, with the right being greater than the left. Dr. Dick prescribed Lortab for pain management. (R. 795-94).

At the request of the Social Security Administration, the claimant completed a "Function Report-Adult" on August 16, 2012. In that report, the claimant stated that she takes care of her two-year-old grandson; can cook and clean, but it takes her all day because she only can do things a little at a time; and cannot stand, sit, or lay for a long time. The claimant further stated that she can feed herself and use the toilet, but it takes her a while to care for her hair, dress, shave, or bathe herself. The claimant also stated that she prepares her meals daily, but it takes her most of the day; can clean daily; can do laundry twice a week; can iron once a week; and can grocery shop in stores twice a month for two hours. The claimant mentioned that she does not

drive because does not have a license and she wouldn't feel comfortable driving with pain. (R. 221-224).

Regarding her activities, the claimant stated in her Function Report that she watches TV off and on daily between daily chores, and typically talks to and goes to take care of personal business with others. She further stated she regularly goes to pay bills and shop for groceries and clothes twice a month; however, she needs someone to accompany her. (R. 225).

Regarding her abilities, the claimant stated in her Function Report that she has pain when lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, and using her hands. The claimant mentioned she cannot walk far at all before needing to stop and rest; when she does rest, she stated that it takes her two to three minutes before she can resume walking. She further stated that her pain affects her ability to see, concentrate, and sleep because it wakes her up. Additionally, the claimant stated that she can pay attention for a span of fifteen minutes; can finish what she starts; can follow written and spoken instructions well; gets along with authority figures; has never been fired or laid off from a job because of problems getting along with other people; does not handle stress well; does not handle changes in routine well; and has experienced anxiety as a result of her pain. (R. 226-27).

On September 9, 2012, the claimant's live-in friend, Paul Benson, also completed a "Function Report-Adult-Third Party," similar to the report completed by the claimant. Mr. Benson explained that he is usually at work six days a week but, when he can, he is the one who mainly takes the claimant to run her errands. He mentioned the claimant does chores a little at a time but gets everything done. Mr. Benson further stated that the claimant does not need any help or encouragement doing these activities. He explained that the claimant rarely goes shopping. Mr. Benson further explained that the claimant can pay attention well; finishes what she starts;

rarely follows written instructions; can follow spoken instructions; gets along with authority figures; handles stress well; and handles changes in routine well. He mentioned the claimant worries how she is going to be able to take care of herself should something happen to him. (R. 229-35).

At the request of the Social Security Administration, the claimant met with Dr. John Haney, PhD, for a consultative psychological examination on September 25, 2012. The claimant informed Dr. Haney that her friend drove her to the appointment. Dr. Haney then personally examined the claimant and reviewed her medical records. He noted that the claimant appeared sad and tearful but was alert, polite, and cooperative. He further noted that the claimant was not certain as to the reason for the appointment, but her conversation was logical and goal directed.

The claimant informed Dr. Haney that she stopped working because of severe pain from arthritis in her legs and ankles that she has experienced since a motor vehicle accident she suffered in 1985. She explained that she underwent surgery on both ankles and also has severe diabetes and high blood pressure. The claimant further stated that she had "three or four" arrests for possession of a controlled substance and crack cocaine, and served a three year prison sentence until 2006. She explained that, while she occasionally drinks alcohol, she has not used crack cocaine in over five years and has not smoked marijuana in the past seven months. However, she informed Dr. Haney that she smokes one pack of cigarettes daily. When asked if she had any psychiatric hospitalizations and outpatient mental health treatment, the claimant responded that she had not, but she received substance abuse counseling while in prison. (R. 391).

During his psychological examination of the claimant, Dr. Haney noted that she was oriented to time, place, and person; was unable to subtract serial sevens but was able to count

forward by threes; had difficulty performing most simple problems in change making and arithmetic; was able to find some abstract similarities between paired objects and interpret simple proverbs; gave little accurate general information; recalled four digits forward and four backward and none of three objects after five minutes; appeared "generally intact" regarding her recent and remote memory; and had an estimated low average to borderline range of intelligence. (R. 391).

Dr. Haney additionally noted that the claimant showed no psychotic symptoms, such as auditory or visual hallucinations, delusions, ideas of reference or grandiosity. The claimant admitted to Dr. Haney that she had been feeling more depressed since her son overdosed on drugs and died in January 2012. The claimant stated she has experienced sadness; crying spells; pain; worry; an inability to feel happiness; poor memory and concentration; inability to relax; and disturbed sleep, lack of energy, and decreased appetite. However, when asked if she had any suicidal thoughts or attempts, she informed Dr. Haney that she had not. Dr. Haney also noted that the claimant's insight appeared poor but that she seemed able to manage her own funds, should any be awarded to her. (R. 392).

When asked to describe an average day, the claimant explained to Dr. Haney that her day begins around four-thirty in the morning. She further explained that she mostly stays home, cares for her grandson, does light household chores, and denied other hobbies or leisure or social activities, except that she "used to" enjoy walking. (R. 391).

Dr. Haney noted that the claimant will probably require further medical assessment and treatment of multiple physical problems and depressive symptoms. He further noted that the claimant's ability to function in most jobs appeared moderately to severely impaired because of physical and emotional limitations and that the claimant's condition would likely remain

unchanged for the next six to twelve months. Dr. Haney diagnosed the claimant with major depressive disorder, recurrent, an anxiety disorder, polysubstance abuse in remission, and unresolved bereavement. (R. 392).

The following day, the claimant met with Dr. Marlin Gill at Gill Family Medicine, for a consultative examination at the request of the Social Security Administration. Dr. Gill personally examined the claimant and reviewed her medical records. Dr. Gill stated the claimant seemed confused, noting that she walked in and out of the exam room wearing the gown while asking for her grandson, was sluggish and slurring her speech. The claimant reported pain when bending past sixty degrees, stating it makes the back of her legs hurt. The claimant further stated she experienced pain with movement. (R. 394-95).

Regarding her activities of daily living, the claimant reported to Dr. Gill that she takes care of her personal needs and occasionally cleans, cooks, washes dishes, and loads the dishwasher. She further mentioned that she is able to drive occasionally but it is infrequent. In addition, the claimant reported going to the grocery store for brief shopping trips with family members sometimes. (R. 394).

During his physical examination of the claimant, Dr. Gill noted that the claimant walked slowly into the exam room without assistance; could get on and off the exam table without assistance; had no tenderness in the back; could bend forward to sixty degrees from standing position; could squat down "one-third way" and come back up again, but her ankles hurt; had good range of motion in her lower joints; and could lift her legs off the exam table with strength of 4/5. Dr. Gill noted that the claimant's right ankle showed "medial and lateral incision scars" and the left ankle showed a "median incision scar." Dr. Gill further noted that, although the claimant complained of pain when moving either ankle, he noted no tenderness. However,

because of the pain that the claimant expressed, she would not toe-heel walk. Dr. Gill diagnosed the claimant with bilateral ankle pain and listed the claimant's medications as Lortab, Xanax, Lisinopril, Metformin, and Zocor. (R. 394-95).

At the request of the Social Security Administration, state agency psychological consultant Dr. Robert Estock reviewed the claimant's records and completed a "Disability Determination Explanation" on October 18, 2012. In his explanation, Dr. Estock opined that the claimant's affective disorder was severe and she had moderate restrictions in activities of daily living; moderate difficulty maintaining social functioning; and moderate difficulty maintaining concentration, persistence or pace. In making this finding, Dr. Estock took into consideration the claimant's "sluggish" behavior at her appointment with Dr. Gill. In addition, he noted that she had no episodes of decompensation of extended duration. (R. 83-93).

A few months later on January 21, 2013, the claimant went to the Decatur Morgan Hospital following an injury to her right hand and a sprained right ankle as a result of a fall. Dr. Vernon Hurst ordered an x-ray of the claimant's ankle that revealed "prior trauma and extensive postsurgical changes to the distal fibula and tibia" and "no acute fracture nor dislocation." (R. 698, 702-04).

Three months later, on April 21, 2013, the claimant once again presented to the Emergency Department at Decatur Morgan Hospital after falling and injuring her lumbar spine. During his physical exam, Dr. Hurst noted the claimant's blood pressure was 109/68. In addition, Dr. Hurst ordered an x-ray that showed no fracture or misalignment of her vertebrae, except for small bone spurs throughout her lumbar spine. Dr. Hurst diagnosed the claimant with a lumbar sprain. (R. 683, 686-88, 695).

On January 23, 2014, the claimant met with Dr. Gill to receive refills on her prescriptions. Dr. Gill prescribed the claimant Narco 10 and Xanax, but noted that she "will no longer be prescribed any controlled substances due to drug screen results" being abnormal. (R. 397, 790).

On June 29, 2014, the claimant again went to the Emergency Department at Decatur Morgan Hospital, complaining of headache, back pain, and elevated blood pressure. The claimant reported the severity of her pain as mild. Dr. Jerry Robbins noted that the claimant had not been taking her blood pressure medication for the past two months because she was out of them. During his physical examination, Dr. Robbins noted that the claimant had no tenderness in her back; normal range of motion in her legs; normal gait; no calf tenderness; and a stable pelvis. He further noted that the claimant's psychological exam showed normal mood/affect. Dr. Robbins diagnosed the claimant with headache, hyperglycemia, and "general patient noncompliance," as a result of not taking her blood pressure medication for two months. (R. 562-64).

On July 17, 2014, the claimant completed another "Function Report-Adult" at the request of the Social Security Administration. In that report, the claimant expressed little change, except that Mr. Benson now helps her to feed, bathe, and just care for her eighteen-month-old "special needs" granddaughter and her four-year-old grandson. She also stated that, when she is walking, she has to rest for five minutes before she resumes. The claimant further stated that she prepares mainly sandwiches and frozen dinners once a week; on very few occasions does the claimant cook meals, and if she does, it takes all day long, because she does "a little at a time." Regarding her chores, the claimant mentioned that she cleans and does laundry once a week and that it takes her all day; however, she does not need any help or encouragement to do them. The claimant

further explained that she can travel by walking or riding in a car, and she can shop for groceries at stores, but it takes her three to four hours and she goes once a month. (R. 252-58).

Regarding her activities, the claimant stated in her Function Report that she spends her day watching television and cannot do other activities anymore. As far as her social activities, the claimant only talks to others on the phone a couple times a week. She further stated that the only place she regularly goes is her granddaughter's doctor's appointments, which are every two to three months. (R. 256).

On August 6, 2014, the claimant met with Dr. Verne Webster for the first time at Horizons Medical Center for evaluation of her chronic pain and to follow her care with hypertension, anxiety, and diabetes. During his physical exam of the claimant, Dr. Webster noted that her gait was normal. Dr. Webster diagnosed the claimant with chronic low back pain and an anxiety disorder and listed the claimant's medications as Lisinopril, Metformin, Norco, and Xanax. (R. 455-56).

At the request of the Social Security Administration, Dr. Estock again examined the claimant's medical records and completed another "Disability Determination Explanation" on August 25, 2014. In his explanation, Dr. Estock opined that the claimant's affective disorder was nonsevere and that she had no restrictions in activities of daily living or difficulty maintaining social functioning, and only a mild difficulty maintaining concentration, persistence, or pace. In making this finding, Dr. Estock considered the claimant's recent medical record showing a normal mood/affect and her recent Function Report stating the types of activities she could perform. He additionally noted the claimant had no episodes of decompensation. (R. 103-13).

The claimant followed up with Dr. Webster on September 4, 2014, reporting anxiety and chronic pain in her back, legs, and ankles. During his physical examination of the claimant, Dr.

Webster noted under the "Musculoskeletal" section that the claimant had a normal gait and no scoliosis, despite the claimant's reports of joint and back pain. Furthermore, Dr. Webster noted that the claimant's deep tendon reflexes, motor strength, and sensory responses were normal. Dr. Webster diagnosed the claimant with chronic low back pain and anxiety disorder and prescribed Xanax and Norco. (R. 721-24).

On October 2, 2014, the claimant met with Dr. Caswall Harrigan at Horizons Medical Care for pain evaluation and refills on her medications.[1] Dr. Harrigan refilled her prescriptions of Norco for pain, Xanax for anxiety disorder, and Flexeril for muscle spasms of the claimant. (R. 727-28).

Less than a month later, on October 30, 2014, the claimant again presented to Horizons Medical Care to meet with Dr. Harrigan for pain evaluation and medication refills. During his physical exam of the claimant, Dr. Harrigan noted the claimant's left ankle had "mild tenderness" and "surgical scars." Dr. Harrigan also noted the claimant's back exam as normal. Dr. Harrigan refilled the claimant's medications of Robaxin for muscle spasms, Norco for pain, and Xanax for anxiety disorders. (R. 730-32).

On November 28 and December 26, 2014, the claimant again presented to Horizons Medical Care, this time to meet with Dr. Webster. The claimant rated her pain as a 9/10 and stated that her chronic lower back pain has been getting worse as she gets older. During his physical exam of the claimant, Dr. Webster noted the claimant's back exam as normal and  that she still had "mild tenderness" and "surgical scars" on her left ankle. During the claimant's neurological exam, Dr. Webster further noted that the claimant has normal deep tendon reflexes. Dr. Webster refilled the claimant's previous medications. (R. 733-39).

---

[1] The record does not indicate why the claimant chose to see Dr. Harrigan.

The claimant arrived at Horizons Medical Care for her monthly follow-up on January 23, 2015, this time meeting with Dr. Harrigan. The claimant reported her pain as an 8/10. During his physical exam of the claimant, Dr. Harrigan noted the claimant was tender upon palpitation of her back, but her reflexes were normal. Dr. Harrigan refilled the claimant's previous medications. (R. 741-43).

The claimant returned to Horizons Medical Care for her next follow-up appointment on February 23, 2015. During Dr. Webster's physical exam of the claimant, he noted that the claimant's back exam was normal; noted mild tenderness in the claimant's left ankle; and noted normal reflexes during the claimant's neurological exam. Dr. Webster refilled the claimant's previous medications. (R. 747-49).

Between March 23 and June 18, 2015, the claimant had four follow-up appointments at Horizons Medical Care with Dr. Webster or Dr. Harrigan. At each visit, although the claimant complained of severe pain, both doctors noted that the claimant's back exam continued to be normal with no neck tenderness, no muscle weakness, and "no generalized decrease in strength." They further noted that the claimant's blood pressure was in the normal range. (R. 751-53, 755-57, 761-63, 767-69).

On July 4, 2015, the claimant presented to the Emergency Department at Decatur Morgan Hospital, after falling on her left arm. During his physical and mental exam of the claimant, Dr. Alan Heins noted that the claimant was oriented; however, he found swelling and tenderness in her left arm. Dr. Heins diagnosed the claimant with "closed fracture of trapezium bone of wrist," and prescribed Naproxen and Hydrocodone. (R. 508-10).

The claimant's next two follow-up appointments took place on July 17 and August 17, 2015, both with Dr. Webster. During both visits, Dr. Webster noted similar findings as before, such as a normal back exam and "no generalized decrease in strength." (R. 771-73, 775-77).

On September 12, 2015, the claimant presented to the Emergency Department at Decatur Morgan Hospital with complaints of chest pain. The claimant explained that she was under "a lot" of stress and has a two year old granddaughter "on hospice" for seizures. Dr. Tom-Meka Archinard personally examined the claimant, noting that her physical status was normal and her psychiatric status showed a normal mood/affect. Dr. Archinard referred the claimant back to Dr. Webster for a follow-up. (R. 476-78).

The claimant continued to meet with Dr. Webster on September 15 and October 15, 2015. During both visits, the claimant rated her pain as a 9/10, but Dr. Webster documented the same findings as before, except that he noted the claimant had tenderness on palpitation of her back, in addition to noting a normal back exam. (R. 781-83, 785-87).

At the request of the Social Security Administration, Dr. Webster completed a questionnaire regarding the claimant's ability to do work-related activities on October 15, 2015. In his questionnaire, Dr. Webster indicated that the claimant could lift less than ten pounds occasionally and frequently; could stand, walk, or sit for a maximum of less than two hours; could sit or stand for ten minutes before having to change her position; must lie down every two hours; could occasionally twist; and could not stoop, bend, crouch, or climb stairs or ladders. Dr. Webster stated that the claimant could not push or pull or perform gross manipulations. He further stated that the claimant's pain symptoms will frequently interfere with the attention and concentration required to perform simple work-related tasks. (R. 715-16).

At the video hearing before the ALJ on December 15, 2015, the claimant testified that she worked as a cashier at a convenience store until 2011. She said she was not fired or laid off, but stopped working because "[she] couldn't do it anymore." The claimant testified that she previously worked as a meat clerk at Holaway's and as a waitress at Ruby Tuesday's. She stated that the meat clerk position consisted of waiting on customers; wrapping meat; placing meat on pans and in the coolers; and pulling meat out of the freezer. She mentioned that this job required frequent lifting and bending to get the items needed. Regarding her waitress position, the claimant testified that she took orders, took food to the tables, and cleared the tables. (R. 44, 46, 49, 55).

When asked why she cannot work, the claimant testified that her back has "gradually" worsened since her car accident in 1985, and as a result, she cannot perform jobs anymore because the pain was "too bad." The claimant described the pain as a sharp pain in her back that is constant and aching and shoots down her leg into her foot. The claimant rated her everyday pain as an 8/10 and as a 10/10 without medication. She testified that she takes Norco 10s for her pain; Xanax for anxiety; Lisinopril for blood pressure; and metformin for diabetes. When the ALJ specifically asked the claimant if she had any side effects from her medications, she replied she did not. She also stated that she occasionally props her legs up on a pillow to help with the pain. (R. 51-56).

The claimant testified that she lives with her six-year-old grandson, whom she takes care of, and her friend of twenty years, Paul Benson[2]. Describing her daily activities, the claimant stated that she cooks, cleans, and does laundry but it takes her "a long time to do them." She

---

[2] The claimant's granddaughter died September 30, 2015.

further stated that she goes shopping at the grocery store once a month or once every two weeks, and Mr. Benson is always with her. She testified that grocery shopping is something she "really has to do." The claimant mentioned that she does not drive because her license was suspended, not because she cannot physically do so. (R. 56, 61-63).

A vocational expert, Barbara Azzam, testified concerning the type and availability of jobs that the claimant can perform. Ms. Azzam testified that the claimant's past relevant work was a waitress, classified as light, semi-skilled work; convenience store clerk, classified as light, semi-skilled work; and meat clerk, classified as light, semi-skilled work. The ALJ asked Ms. Azzam to assume a hypothetical individual the same age, education, and experience as the claimant who is limited to performing work at the medium exertional level with occasional postural limitations. Ms. Azzam testified that individual could perform the claimant's past work as a waitress and a convenience store clerk; however hazardous exposure would preclude the meat clerk position. (R. 66, 71-72).

In his next hypothetical, the ALJ asked Ms. Azzam to assume all of the prior limitations except with a light exertional level. Ms. Azzam testified that individual could perform the claimant's past work as convenience store clerk and waitress. (R. 72-73).

Finally, the ALJ asked Ms. Azzam to assume all of the prior limitations except that the individual was limited to performing simple tasks. Ms. Azzam testified that individual could work as an assembler, classified as light, unskilled work, with over 500,000 jobs nationally; product marker, classified as light, unskilled work, with over 500,000 jobs nationally; and packager, classified, as light, unskilled work, with over 400,000 jobs nationally.[3] (R. 73-74).

---

[3] Ms. Azzam did not testify to the number of jobs available in the state of Alabama.

On January 21, 2016, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2013, and had not engaged in substantial gainful activity since her alleged onset date of December 5, 2011. (R. 19-27).

Next, the ALJ found that the claimant had the severe impairments of lumbar spondylosis and bilateral ankle osteoarthritis. However, the ALJ found out that the claimant's high blood pressure, diabetes mellitus, and anxiety disorder were non-severe impairments. The ALJ acknowledged the claimant's high blood pressure, but found that the record indicates that her medication controls her condition and medical records showed a normal blood pressure range while on medication. (R. 21-22).

Regarding her diabetes with neuropathy in her feet, the ALJ found that the record shows the condition does not significantly limit the claimant's ability to perform basic work activities. The ALJ noted that the claimant's physical examination results showed normal sensation in her lower extremities and a normal gait. Furthermore, the ALJ noted that the record shows that medications control the claimant's diabetes well. (R. 22).

Concerning her anxiety disorder, the ALJ acknowledged that Dr. Haney diagnosed the claimant with major depressive disorder and an anxiety disorder.[4] However, he found that the claimant's medical records continuously revealed her mood and affect to be normal. The ALJ further noted (1) the fact that the claimant stated no problems in getting along with others; and (2) the fact that the medical record provides no evidence of decompensation. Consequently, the ALJ determined that the claimant's mental impairments were nonsevere. (R. 22).

---

[4] The ALJ did not specify what weight he gave to Dr. Haney's opinion.

The ALJ next found that the claimant did not have an impairment of combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ did not discuss any specific Listing that he may have considered. (R. 24).

Next, the ALJ determined that the claimant has the residual functional capacity to perform light work except that the claimant can occasionally climb, balance, stoop, kneel, crouch, and crawl and must avoid exposure to hazards, such as moving machinery or unprotected heights. (R. 24). In making this finding, the ALJ considered the claimant's symptoms and corresponding medical records. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause her symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of those symptoms were not fully consistent with the evidence of the record. Specifically, the ALJ noted that the claimant's medical records, clinical presentations, and diagnostic testing are inconsistent with disabling ankle pain. The ALJ noted that the claimant's medical records dating back to August 6, 2014, show that the claimant had a normal gait, zero to mild tenderness, and no fracture or dislocation. The ALJ articulated that the only abnormalities indicated in the record were "mild tenderness" and "surgical scars." (R. 25).

Regarding the claimant's disabling back pain, the ALJ noted that the claimant's medical records, clinical presentations, and diagnostic testing are inconsistent with her claim. Specifically, the ALJ took into account the claimant's numerous prior physical examinations that showed her back to be "normal." While the ALJ acknowledged some records of tenderness on palpitation of her back, he pointed to the most recent records that demonstrated the claimant's back was normal. (R. 25).

The ALJ took into account that the claimant's prescription narcotic pain medication typically supports her allegations of severe back and lower extremity pain. However, based on the claimant's history of substance abuse and Dr. Gill's refusal to prescribe controlled substances to the claimant because of her drug screen results, the ALJ questioned whether the claimant used the medications for pain. (R. 26).

The ALJ gave little weight to Dr. Estock's 2012 assessment because it was "inconsistent with the record as a whole." The ALJ pointed out that Dr. Estock's assessment of the claimant's affective disorder as severe was inconsistent with the claimant's medical records showing the claimant had normal mood and affect upon psychiatric examination. Furthermore, the ALJ explained that Dr. Estock's assessment of the claimant having moderate limitations in social functioning was inconsistent with the claimant's initial function report, in which she states she has no problems getting along with others. (R. 23).

On the contrary though, the ALJ gave significant weight to Dr. Estock's 2014 assessment because it was "consistent with the record as a whole." The ALJ noted that Dr. Estock's assessment of the claimant's affective disorder as nonsevere was consistent with the claimant's recent medical records, showing the claimant had no anxiety and a normal mood and affect. (R. 23).

The ALJ gave little weight to the opinion of the claimant's treating physician Dr. Webster because it was inconsistent with the record as a whole. The ALJ noted that Dr. Webster's opinion that the claimant can only lift and carry less than ten pounds occasionally was inconsistent with the claimant's April 2013 lumbar spine x-ray, that showed solely small bone spurs throughout the lumbar spine. In addition, the ALJ noted that Dr. Webster's opinion that the claimant can only stand and walk less than two hours in an eight hour work day was inconsistent

with the claimant's medical records in August 2014, June 2014, and September 2015, which all showed a normal gait and normal lower extremities, with the exception of a scar on the right ankle. (R. 26).

Finally, based on the vocational expert's testimony, the ALJ found that the claimant was capable of performing her past relevant work as a waitress and as a convenience sales clerk, all classified as light, semi-skilled work. Additionally, the ALJ found that the claimant could work as an assembler, product marker, or packager, and that those jobs existed in significant numbers in the economy. Thus, the ALJ concluded that the claimant was not disabled as defined under the Social Security Act. (R. 27, 74).

## VI. DISCUSSION

The court finds that the ALJ committed reversible error by failing to state the weight he gave to Dr. Haney's opinion regarding the severity of the claimant's mental limitations. The ALJ has the duty to state with particularity the weight he gives to *every* medical opinion. His failure to do so constitutes reversible error. *See Sharfaz*, 825 F.2d at 279 (holding that the ALJ's failure to state the weight given to different medical opinions is reversible error).

Here, the ALJ merely acknowledged Dr. Haney's opinion, but he failed to state the weight he gave that opinion. Instead, the ALJ, in essence, *ignored* Dr. Haney's opinion that the claimant had major depressive disorder and an anxiety disorder that caused her moderate to severe impairments in her ability to "function in most jobs." Moreover, the ALJ ignored Dr. Haney's opinion and included no non-exertional limitation in the residual functional capacity to account for *any* mental impairment diagnosed by Dr. Haney. By failing to state the weight he gave Dr. Haney's opinion, the ALJ committed reversible error.

*Other Concerns*

The ALJ chose to give Dr. Estock's 2014 opinion "significant weight" over Dr. Haney's where Dr. Estock *merely reviewed the claimant's records*. Dr. Haney personally examined the claimant and assessed his opinion based not only on the claimant's subjective statements, but also on his personal observation of the claimant and on his expertise in evaluating patients with mental impairments. Generally, the ALJ should give more weight to an examining specialist in the mental health field over a doctor who merely reviewed records. *See Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985) (quoting *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (11th Cir. 1985) (The "opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician.").

The court is also concerned that the ALJ further gave "significant weight" to Dr. Estock's 2014 opinion that the claimant "had no restrictions in activities of daily living." The ALJ articulated that opinion was consistent with the claimant's 2014 Function Report because the claimant stated her daily activities include "taking care of her grandson, preparing meals, cleaning, doing laundry, shopping in stores, and watching television." However, the ALJ failed to consider the claimant's 2014 Function Report in its entirety, in which the claimant stated that she *receives assistance in doing these activities*. The claimant further stated in her report that the meals she "prepares" are "mainly sandwiches and frozen dinners *once a week*," and, if she were to cook, it would take her "all day long, doing a little at a time." The claimant also reported that she cleans and does laundry, but she does so *once a week* and it "*takes her all day*." The ALJ seemed to simply ignore the facts in the record that did not support his findings to justify the significant weight he gave to Dr. Estock's second opinion. On remand, the ALJ should accurately reflect the facts in deciding the weight to give each medical opinion.

In addition, the ALJ seemed to imply that the claimant may still have a substance abuse problem. The ALJ referenced the fact that Dr. Gill refused to prescribe the claimant any controlled substances after an abnormal drug screen result. However, the ALJ seemed to ignore Dr. Haney's diagnoses of polysubstance abuse in remission. On remand, the ALJ should clearly articulate whether he finds that the claimant has a substance abuse problem. If so, the ALJ should thoroughly address SSR 13-2p that dictates what the ALJ must do if he makes a substance abuse determination.

## VII. CONCLUSION

For the reasons stated above, this court concludes that the decision of the Commissioner is due to be REVERSED and REMANDED for action consistent with this Memorandum Opinion.

The court will enter a separate Final Order.

DONE and ORDERED this 25th day of September, 2018.

_Karon O. Bowdre_

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE